ROBERT M. CHIPLOCK et al., Individually and as Parents and Natural Guardians of ROBERT J. CHIPLOCK et al., Infants, Respondents, v NIAGARA MOHAWK POWER CORPORATION, Defendant and Third-Party Plaintiff-Appellant, and TOWN OF COLONIE, Appellant. WALWORTH COMPANY, Third-Party Defendant-Appellant. (Action No. 1.)

LEONARD CYR et al., Respondents, v NIAGARA MOHAWK POWER CORPORATION, Defendant and Third-Party Plaintiff-Appellant. WALWORTH COMPANY et al., Third-Party Defendants-Appellants. (Action No. 2.)

STATE FARM FIRE AND CASUALTY COMPANY et al., as Subrogees of ROBERT M. CHIPLOCK et al., Respondents, v NIAGARA MOHAWK POWER CORPORATION et al., Appellants. (Action No. 3.)

Third Department, January 7, 1988

## APPEARANCES OF COUNSEL

*Donohue, Donohue & Sabo, P. C. (Fred J. Hutchison* of counsel), for Town of Colonie.

*Maynard, O'Connor & Smith (Christine Kirwin Krackeler* of counsel), for Niagara Mohawk Power Corporation.

*Carter, Conboy, Bardwell, Case & Blackmore (Edward D. Laird, Jr.,* of counsel), for Walworth Company.

*E. Stewart Jones (Jeffrey K. Anderson* of counsel), for Robert M. Chiplock and another.

*Bouck, Holloway, Kiernan & Casey (John R. Casey* of counsel), for State Farm Fire and Casualty Company and another.

### OPINION OF THE COURT

YESAWICH, JR., J.

In 1954, Niagara Mohawk Power Corporation (hereinafter NiMo) installed an underground gas service for 298 Watervliet-Shaker Road in the Town of Colonie, Albany County. The service lateral from the gas main to the property contained a cast iron shut-off valve operated from the surface and manufactured by Walworth Company (hereinafter Walworth). The following year, a steel valve was installed on the service

lateral and the cast iron valve was permanently opened, rendering it a mere conduit.

During the winter of 1958-1959, extraordinarily cold weather resulted in six gas leaks due to valve failures. A study ordered by NiMo revealed that the cast iron Walworth valve was not capable of withstanding certain stresses, such as movement of laterals occasioned by excavation work and severe frost. At that point, NiMo already had over 6,500 such valves in service. It discontinued further use of the valve but had no record of the location of the existing valves. Pursuant to an agreement with the Public Service Commission, NiMo has been removing the suspect valves upon discovery. Sometime prior to 1979, the service lateral at 298 Watervliet-Shaker Road was bent; the bend, which was adjacent to the Walworth valve, was essentially in line with sewer line excavation which had been conducted by the Town of Colonie (hereinafter Town).

From February 1, 1974 through February 9, 1979, Robert Chiplock, his wife and four children resided at 298 Watervliet-Shaker Road. At 10:30 P.M. on February 8, 1979, a tow truck operator, Andrew Gidley, was driving by their home when he noticed the odor of natural gas. He immediately radioed his dispatcher and told him to contact the police about the natural gas odor. The call was received by the Town's Police Department at 11:00 P.M., but police were not dispatched to the scene until 11:28 P.M. On his return trip, at about 11:15 P.M., Gidley again smelled natural gas, slowed to ascertain its location, and noticed a hissing sound. He then stopped at a fire station, called the police himself and, upon arriving at his employer's garage, confirmed that his dispatcher had called the police.

Robert Chiplock arrived home from work around 11:30 P.M. and noticed a peculiar odor upon leaving his car. He briefly looked about outside, then checked the pilot light in his furnace, but upon finding it lit, he "figured" that the smell was not natural gas. Shortly thereafter, two police officers appeared at the Chiplock home and the three walked around outside in search of the origin of the smell. After discussing a sewer gas problem Chiplock had experienced and noting the intensity of the odor near a manhole, the officers decided to call the Sewer Department and told Chiplock to go inside and they would "take care of it". The officers left at 11:48 P.M. and the Sewer Department was contacted at 12:10 A.M. A Sewer Department employee arrived at the Chiplock home at 12:40

A.M., immediately identifying the odor as natural gas. Chiplock had waited up for the Sewer Department employee and went out to investigate when he arrived, but Chiplock returned to his house when another police car appeared. One of the officers in the police car, Leonard Cyr, also identified the odor as natural gas and radioed the police dispatcher to quickly send NiMo to the area. NiMo was contacted at 12:45 A.M. Cyr then went inside the house to call NiMo himself. While on the phone, he told Chiplock to go downstairs to shut off the furnace. At Chiplock was going downstairs, an explosion occurred, setting the house on fire. The house was decimated and its contents destroyed, but Cyr and the Chiplock family escaped without grave injuries.

Subsequent investigation revealed that the cast iron valve on the gas lateral to the Chiplock home had fractured, allowing gas to escape and seep through their foundation into their house. Robert and Patricia Chiplock, individually, as spouses and on behalf of their children, brought personal injury and property damage claims sounding in negligence against NiMo and the Town to recover money damages sustained as a result of the explosion (action No. 1). NiMo impleaded Walworth as a third-party defendant asserting that if the Chiplocks recovered damages against NiMo, those damages were caused solely by Walworth's negligence with respect to its manufacture, design and construction of the valve installed in the gas line system servicing the Chiplock home. In an action by Cyr and his wife brought against NiMo to recover for personal injuries and loss of consortium (action No. 2), NiMo impleaded both Walworth and the Town. State Farm Fire and Casualty Company and State Farm Automobile Insurance Company (hereinafter collectively referred to as State Farm), as subrogees of the Chiplocks, began an action against NiMo and the Town seeking reimbursement of money paid to the Chiplocks as a result of the explosion (action No. 3). State Farm amended its complaint to include Walworth as a defendant after Walworth had been impleaded by NiMo.

The three actions, tried together before a jury, resulted in damage awards in action No. 1 for personal injuries, pain and suffering of $50,000 to Chiplock, $75,000 to Mrs. Chiplock, and $10,000 to each Chiplock child. Additional sums were awarded to the Chiplocks for property losses, loss of consortium, lost wages and medical expenses. Liability in this action was apportioned 66⅔% to NiMo and 33⅓% to the Town. In action No. 2, the Cyrs were awarded a total of $104,000, liability

apportioned as in action No. 1. In action No. 3, State Farm's ultimate award was for $76,035.18 with liability apportioned 60% to NiMo, 30% to the Town and 10% to Walworth. As a result of various posttrial motions, Supreme Court, in addition to reducing the Chiplocks' verdicts with respect to the lost wages and personal property loss they sustained, allowed the Cyrs to increase their ad damnum clause from $75,000 to $100,000 to conform to the jury's verdict. NiMo, the Town and Walworth each appeal.*

■ At the outset we note that the jury's finding that NiMo was negligent and that its negligence was a proximate cause of this accident is fully supported by the evidence. There was proof from which the jury could have concluded that NiMo failed to take prompt or adequate action to replace the Walworth valve which NiMo knew was faulty in that it was likely to fracture under stress (see, Nichols v Niagara Mohawk Power Corp., 37 AD2d 909, affd 33 NY2d 670).

The issue pressed by the Town, that the Chiplocks failed to show that a special relationship arose between the Town and the Chiplocks such that the Town might be liable for the damages suffered by the individual plaintiffs, is more difficult of resolution. In addressing this issue, it is important to bear in mind that the thrust of the Town's argument is not that it cannot be held liable because its personnel in discharging a governmental function failed to exercise correct judgment (cf., Kenavan v City of New York, 70 NY2d 558, 568), but rather that said plaintiffs failed to show that a special relationship existed at all.

The elements for establishing a special relationship were recently laid out in Cuffy v City of New York (69 NY2d 255, 260): "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." It is the Town's contention that the final element, justified reliance, is lacking in this case. The Town focuses on the fact that none of the Chiplocks called the police and Chiplock even testified during trial that he never felt that he was in danger.

---

* Although Walworth filed notices of appeal with respect to the judgments in actions No. 1 and No. 2, no liability was assessed against it in these actions.

■ Justified reliance is a fact issue that has been resolved in favor of the Chiplocks by the jury, limiting our inquiry to whether the jury's finding is borne out by the evidence. The jury's finding may well be based on the inference, supported by the record, that because the police arrived so soon after Chiplock discovered the odor he did not pursue steps he might well have taken in their absence. Once the police came he understandably relaxed his own vigilance, deferring to their expertise in matters of public safety, and indeed Chiplock testified that the officers told him to go inside the house and assured him they would take care of the problem. Even after being informed by Cyr that the odor was natural gas, Chiplock was not told to evacuate but instead to go to the basement to shut off the furnace, an instruction he faithfully obeyed, demonstrating his reliance on the police. As for the suggestion that a special relationship could not have been established because the Town assumed the affirmative duty at the instigation of someone other than the party ultimately injured, we note that in *Sorichetti v City of New York* (65 NY2d 461, 469) direct contact between agents of the municipality and the injured party was not required *(see, Cuffy v City of New York, supra,* at 262).

A related claim on this appeal is that Supreme Court erred when it instructed the jury to determine the first element necessary for establishing a special relationship, i.e., whether an affirmative duty had been assumed by the Town. The argument is that imposition of duty is exclusively a question of law and therefore for the court to decide. We see this element as raising a mixed question of law and fact: what were the actions and promises of the municipality and do they constitute the assumption of a duty? In the circumstances prevailing, this element, like the other three, was an issue for the jury to determine.

■ NiMo maintains that the awards to Cyr and the Chiplocks for their personal injuries and emotional distress are not supported by evidence in the record and thus are excessive. Expert medical testimony supported Cyr's permanent ear injury, tinnitus, and the hospital records attested to painful first and second degree burns to the arm of Mrs. Chiplock, and miscellaneous insubstantial injuries to some of the children. Chiplock sustained a back injury when debris from the explosion fell on him, for which he was treated for several years and which at the time of trial still continued to cause him discomfort. The bulk of the awards to Cyr and the Chiplocks

are attributable to the emotional distress and shock they necessarily experienced the night of the explosion when they were all engulfed in flames. To the extent that NiMo depends on *Bovsun v Sanperi* (61 NY2d 219, 228-231) to challenge these verdicts, that reliance is misplaced. The Chiplocks need not rely on distress caused by injury to fellow family members here, although that was undoubtedly a factor, because each was in distress as a result of the breach of a duty owed by defendants to each particular plaintiff in action No. 1 *(see, Kennedy v McKesson Co.,* 58 NY2d 500, 504-505); these plaintiffs were not mere bystanders. While the verdicts may well be generous, they are not such as to shock the conscience of the court. In this respect, it is not without significance that Supreme Court has already reduced those verdicts that were clearly excessive and those that were not reduced, with one exception, are supported by the evidence. With respect to one of the Chiplock children, Kevin, he did not testify, nor was other evidence offered that was sufficient to provide the jury with a basis for awarding him $10,000 in damages for his pain and suffering. The amended judgment entered in action No. 1 must therefore be modified and reduced accordingly.

■ Walworth argues that the evidence does not support a finding that its valve was defectively designed, noting that the valve was not recommended for use where temperatures dropped under 20 degrees below zero Fahrenheit and that knowledgeable consumers are responsible for their informed choices in product selection *(see, Rainbow v Elia Bldg. Co.,* 79 AD2d 287, 291, *affd* 56 NY2d 550). The fracture that allowed natural gas to escape was attributed by the various experts who testified at trial to the valve's inability to withstand stresses exerted on the valve by a bend in the adjoining pipe and movement of the pipe caused by frost. According to one expert, the valve was inadequate for subsurface gas service lines because of its propensity to fail under reasonably predictable bending loads. The experts opined that the breakage could have been avoided had the neck of the valve been thickened or had the valve been constructed of steel or ductile iron. Given this evidence, the jury had sufficient basis to conclude that the risk of the product's failure as designed outweighed the utility of the product *(see, Voss v Black & Decker Mfg. Co.,* 59 NY2d 102, 108).

■ Finally, the jury's findings of negligence on the part of NiMo and the Town and the jury's apportionment of damages between them is amply supported by the record evidence.

Although in actions No. 1 and No. 2, 66⅔% of the damages were apportioned to NiMo and 33⅓% to the Town, and damages in the third action were apportioned 60%, 30%, and 10% among NiMo, the Town and Walworth, respectively, these percentages are not inconsistent. Damages in actions No. 1 and No. 2 were based on negligence, and the jury, responding to specific questions asked of it, found Walworth not to have been negligent. On the other hand, Walworth's liability in action No. 3 was based, not on negligence, but on strict products liability.

We have examined the parties' remaining points and find them to be without merit.

MAHONEY, P. J., KANE, CASEY and LEVINE, JJ., concur.

Judgment in action No. 1 modified, on the law, by reversing so much thereof as awarded damages to Kevin Chiplock and dismissing the complaint on his behalf, and, as so modified, affirmed; judgments in actions No. 2 and No. 3 affirmed; appeal from order dismissed, as academic; with costs to plaintiff.